IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

IN THE MATTER OF THE §
EXTRADITION OF §
MAURICIO ROBLES BONILLA § NO. 1:13-MJ-62
§
§

**MEMORANDUM AND ORDER**

Pending before the court is the United States Government's extradition filed on behalf of the United Mexican States ("Mexico") seeking to extradite Mauricio Robles Bonilla ("the Respondent")[1] for a murder he allegedly committed in Mexico. For the reasons set forth below, the Government's request is GRANTED, and the Respondent is CERTIFIED as extraditable.

## I.    EXTRADITION PROCESS

United States Magistrate Judge J. Scott Hacker thoughtfully discussed the extradition process in In re Extradition of Garcia, 825 F. Supp. 2d 810, 814-16 (S.D. Tex. 2011), and his analysis is recited in the following paragraphs.

The process of extraditing a fugitive from the United States to Mexico is governed by the provisions of the federal extradition statute, 18 U.S.C. §§ 3181–3196, and the extradition treaty between the United States and Mexico (the "Treaty"). The Treaty provides that the United States and Mexico mutually agree to extradite fugitives who are charged with crimes in one country and subsequently found within the territory of the other. Extradition Treaty, U.S.-Mex., art. 1, May 4, 1978, 31 U.S.T. 5059. Moreover, "[i]t is well settled that the terms of an extradition treaty should be liberally construed so as to effect the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses." In re Extradition of Rodriguez Ortiz,

---

[1]    In extradition matters, courts and commentators refer to a person named in an extradition request as the "requested party," "relator," or respondent." For convenience, this memorandum uses "respondent."

444 F.Supp.2d 876, 883 (N.D. Ill. 2006) (citing Factor v. Laubenheimer, 290 U.S. 276, 293–94 (1933)); see United States v. Wiebe, 733 F.2d 549, 554 (8th Cir. 1984).

The foreign extradition process begins with the discovery of a foreign fugitive within the territory of the United States. Mexico may then request the provisional arrest of the fugitive, and the United States must comply with a valid request. Extradition Treaty, U.S.-Mex., art. 11, May 4, 1978, 31 U.S.T. 5059. The request must contain a description of the person sought, a description of his or her alleged crimes, a declaration of the existence of a warrant for his or her arrest, and an undertaking to submit a formal request for extradition. Id. A judicial officer is authorized to issue a warrant for the arrest of any fugitive whose extradition is requested, upon a sworn complaint charging the fugitive with committing an extraditable offense. 18 U.S.C. § 3184. If a formal request for extradition and the required supporting documents are not filed within sixty days of the apprehension of the fugitive, the provisional arrest must be terminated. Extradition Treaty, U.S.-Mex., art. 11, May 4, 1978, 31 U.S.T. 5059. However, this will not prejudice the extradition once the required documents have been submitted. Id.

The second stage in the extradition process is the submission of a formal request for extradition. The required contents of a formal request for extradition, along with supplementary documents, must be submitted through diplomatic channels. Extradition Treaty, U.S.-Mex., art. 10, May 4, 1978, 31 U.S.T. 5059. Among the documents required for a fugitive not yet convicted in the foreign country are a certified copy of the warrant for the fugitive's arrest issued by a judge of the requesting party, and "[e]vidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there." Id. Documentary evidence proffered by the Mexican government shall

2

be admissible in evidence if it is properly authenticated and certified by the principal consular officer of the United States in Mexico. Id.; 18 U.S.C. § 3190.

The next stage in the extradition process is the extradition hearing conducted by a federal court in order to hear the evidence and determine whether that evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. "Extradition shall be granted only if the evidence be found sufficient according to the laws of the requested Party, . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059.

Finally, where the judge determines that the evidence is sufficient to warrant extradition, the judge then certifies to the Secretary of State that the fugitive may be detained and surrendered to the requesting country and forwards all the evidence taken before him to the Secretary of State. 18 U.S.C. § 3184; Ntakirutimana v. Reno, 184 F.3d 419, 422 (5th Cir. 1999). If the fugitive was released on bail from a provisional arrest, the judge must also issue a warrant for the commitment of the fugitive until surrender to Mexico can be made. 18 U.S.C. § 3184. "The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive [branch] in the exercise of its powers to conduct foreign affairs." Escobedo v. United States, 623 F.2d 1098 (5th Cir. 1980). Thus, the executive branch, through the Secretary of State, is the final arbiter of whether an individual will be detained in the United States and delivered to the requesting foreign country. See 18 U.S.C. § 3186; see also Garcia–Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971). If extradition is granted, surrender shall then be made at such time and place as determined according to the laws of the requested country. U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059.

## II. Extradition Proceedings

On May 13, 2013, the United States Attorney for the District of Colorado, acting through an authorized assistant United States attorney, initiated extradition proceedings against the Respondent upon filing of the "Extradition Complaint" (Dkt. No. 1) on behalf of the Mexican Government. This complaint was subsequently dismissed after federal agents learned that the Respondent had left Colorado and was residing in Jasper, Texas. (See Dkt. No. 10.) On May 13, 2013, a sworn complaint raising similar allegations was filed in the Eastern District of Texas. (See Dkt. No. 2.) The Government alleges that the Respondent is wanted for the crime of aggravated homicide by Mexican authorities. Specifically, he is accused of shooting and killing Luis Antonio Navarro Alvarez ("Luis Alvarez") in front of the Municipal Hall of Mezquitic in Jalisco, Mexico. The complaint was supported by two sworn statements provided by Edgar Robles Vazquez and Jose Pedro Rangel Hernandez, two self-declared eye witnesses to the crime. The complaint provided the birthdate and a photograph of the Respondent. The complaint requested this court to issue a warrant pursuant to Title 18, United States Code, Section 3184, for the Respondent's arrest, and, upon execution thereof, that he be brought before the court for hearing on evidence of his alleged criminality. Upon making the required probable cause determination, this Court issued an arrest warrant for the Respondent in accordance with 18 U.S.C. § 3184 and the Treaty. Consequently, the Respondent was arrested, and made his initial appearance before the magistrate court on May 14, 2013. The Respondent retained Gary Tabakman as counsel, and an order of temporary detention was issued by the court. (Dkt. No. 9.)

On November 29, 2013, the Government filed its trial brief detailing the legal authority supporting the Respondent's extradition. (Dkt. No. 29.) The Respondent filed his response in the form of a Motion to Present Testimony at the Extradition Hearing, detailing the evidence to

4

explain and negate the evidence relied on by Government in seeking extradition. (See Dkt. No. 30.)

A hearing to consider evidence of the Respondent's alleged criminality was originally set for May 21, 2013. At the parties' request, the hearing was continued five times. A hearing was finally held on January 14, 2014. Present were the Respondent and his counsel, James Kennedy and Kent Schaffer. Representing the United States was Randy Fluke, Assistant United States Attorney for the Eastern District of Texas.

The United States presented the following documentary evidence:

1. Extradition Request, including translated arrest warrant with underlying facts and copy of the Extradition Treaty Between the U.S. and Mexico,

1A. Diplomatic Note 04649 in Spanish,

1B. Diplomatic Note 04649 (unofficial English translation),

1C. Declaration of Mexican Attorney General with Exhibits 1-9[2],

1D. Supplemental Diplomatic Note 05802 re Statutes (Spanish and unofficial English translation),

1E. Applicable portion of the Criminal code for the State of Jalisco with official translation, and

2. United States Marshal Service Investigative Report.

At the hearing, Deputy United States Marshal James McNeely testified for the Government. Deputy McNeely testified how the Respondent was identified by law enforcement agents in

---

[2] The supporting Exhibits 1-9 include: 1. Arrest warrant dated June 30, 2008, including witness statements from Edgar Robles Vazquez, Victor Cobarrubias, Raul Alaniz Sanchez, Jose Luis Pacheco Vazquez, Jose Elias Nuñez Reyes, Jose Pedro Rangel Hernandez, and Manuel Carlos Robles; 2. Ruling issued on May 12, 2012 by the Jalisco court; 3. Texts of the legal provisions in effect at time the alleged crime occurred; 4. Sworn statement of Edgar Robles Vazquez; 5. Autopsy report of Luis Alvarez, 6. Sworn statement by Jose Luis Pacheco Vazquez; 7. Sworn statement by Jose Pedro Rangel Hernandez; 8. "Ministerial identification proceedings" carried out by Jose Pedro Rangel Hernandez; and 9. Photographs of the Respondent.

5

Jasper, Texas, and described the surveillance that ultimately resulted in his arrest. The substantive content of the Government's exhibits is discussed in more detail below.

The Respondent called no live witnesses, but proffered three exhibits: 1. the declaration of James Kennedy, 2. an affidavit (with English translation) of Gustavo Ivan Ornelas Alvarez (an eye witness to the crime), and 3. an affidavit from Raul Alanis Sanchez ("Raul Sanchez," an eye witness to the crime). Mr. Kennedy's statement summarizes a meeting and conversation with Edgar Robles Vasquez ("Edgar Robles"). The meeting took place at the Buena Vista Minimum Center Prison, where Edgar Robles is serving a term of imprisonment. Mr. Kennedy avers that Edgar Robles told him that he did not see who shot Luis Alvarez, but that the Respondent did not have a gun with him the night of the shooting. Gustavo Ivan Ornelas Alvarez and Raul Sanchez both identify Guillermo Bañuelo Robles as the shooter, not the Respondent.

### III. FINDINGS

**A. Relevant Factors; Sources of Evidence**

Title 18, United States Code, Section 3184, authorizes United States magistrate judges to conduct extradition proceedings. Although Section 3184 requires the court to decide whether "evidence [is] sufficient to sustain the charge," the scope of an evidentiary hearing is not to determine guilt or innocence. Rather, the hearing determines only whether circumstances warrant certification that the respondent is eligible for extradition.

Courts and commentators describe relevant evidentiary factors differently.[3] A logical, more comprehensive listing of all factors, distilled from diverse sources listed in note 2, is as follows:

---

[3] The number of factors varies from case to case. See e.g. In re Extradition of Carlos Nava Gonzalez, 305 F. Supp. 2d 682, 689 (S.D. Tex. 2004); In re Demjanjuk, 603 F.Supp. 1468, 1470 (D.C. Ohio 1985). Commentators also differ on the number of factors. See Glenn MacTaggart. *Determining the Extraditability of Fugitives,* The Federal Lawyer, 29 (Feb. 2004); M. Cherif Bassouni, International Extradition: United States Law and Practice at 820 (4th ed. 2002).

1. Personal and subject matter jurisdiction;

2. Existence of a valid extradition treaty between United States of America and foreign requesting state;

3. Required documents presented in accordance with United States law, translated and duly authenticated by a United States consul;

4. Pending criminal charge in foreign requesting state;

5. Offense charged is extraditable;

6. Offense charged satisfies requirement of double criminality;

7. Respondent is person sought; and

8. Probable cause.

The findings and conclusions below address each listed factor. The evidence from which the court makes its findings consists of (a) documentary exhibits and testimony received into evidence at the hearing convened on January 14, 2013, and (b) documentary exhibits filed with the Defendant's motion to present witness testimony at extradition hearing.

**B.   Uncontested Factors**

Through counsel, the Respondent concedes that sufficient evidence exists to sustain extradition-eligibility factors 1 through 7, above. Although these factors are uncontested, the court nevertheless makes specific findings and conclusions as to each:

1. <u>Personal and Subject Matter Jurisdiction</u>

The United States district court for the Eastern District of Texas has subject matter jurisdiction pursuant to 18 U.S.C. § 3134. This court has personal jurisdiction because the Respondent is present within the territorial jurisdiction of the court.

2. Existence of Valid Treaty

A valid extradition treaty exists between the United States of America and the United Mexican States. See Extradition Treaty Between the United States of America and the United Mexican States, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059.

3. Authenticated Documents

The documentation submitted by the government was authenticated for the United States in accordance with Title 18, United States Code § 3190,[4] as evidenced by the "Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition American Foreign Service" included in the Government's Exhibit 1E.

4. Pending Criminal Charge in Requesting Foreign State

A letter dated July 12, 2013, forwarded the arrest warrant for the Respondent dated June 30, 2008, issued by the Civil and Criminal Matters Judge of the 13th District of Colotlan, Jalisco. The arrest warrant, dated June 30, 2008, was issued for Mauricio Robles Bonilla or Maurilio Robles Bonilla within criminal case number 74/2008 for his probable responsibility in the commission of the crime of aggravated homicide. This crime is set forth and punished by articles 213 and 219, section I of the Criminal Code for the State of Jalisco, in force at the time of the crime.

5. Offense Charged is Extraditable

The offense of murder is listed in the appendix to the above extradition treaty. 31 U.S.T. 5059, appendix. Under Art. 2, § 1 of the treaty, murder is an extraditable offense if punishable in

---

[4] 18 U.S.C. § 3190 states "Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required."

both the United States and Mexico by a deprivation of liberty for no less than one year.  31 U.S.T. 5059, art. 2.

      6.   <u>Dual Criminality</u>

Under Article 213 of the Criminal Code for the State of Jalisco, punishment for aggravated homicide is twenty to thirty-five years of imprisonment.  <u>See</u> Government Ex. 1C.  This court is located in the state of Texas.  Under the Texas Penal Code, murder is punishable by a term of imprisonment of no less than five years to a maximum term of life or 99 years. TEX. PENAL CODE §§ 12.32, 19.02.

Under the United States Code of Crimes and Criminal Procedure, murder in the first degree, if committed within the special maritime and territorial jurisdiction of the United States, is punishable by death or imprisonment for life.  18 U.S.C. § 1111.

      7.   <u>The Respondent is the Person Sought</u>

The Respondent is the person named in the complaint.  His physical features and other identifiers match those of the person whose photograph is attached to the complaint.  Moreover, the Respondent's counsel conceded at the hearing that the Respondent is the person for whom extradition is sought.

**C.   Contested Factor**

The sole contested issue relates to the final factor, *i.e.*, probable cause.  In accordance with Article 3 of the Treaty, the court may grant the extradition request only if the evidence is found sufficient, under the laws of the United States, to justify the committal for trial.  31 U.S.T. 5059, art. 3.  Thus, in the current proceedings under 18 U.S.C. § 3184, the court is charged with inquiring whether the evidence will sustain the charges.  <u>See, e.g.</u>, <u>Extradition of Wise</u>, 168 F.Supp. 366, 372 (S.D. Tex. 1957).  In the United States, evidence that is sufficient to sustain the

charges requires a showing of probable cause. Extradition of Diaz Medina, 210 F.Supp.2d at 816; see, e.g., In re Extradition of Cervantes Valles, 268 F. Supp. 2d 758, 771-72 (S.D. Tex. 2003)

Probable cause is the "existence of reasonable grounds to believe the accused committed the offense charged." Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971). The government must show evidence "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C. 1973); see also Michigan v. DeFillipo, 443 U.S. 31, 37 (1979). There are essentially two inquiries. First, the evidence must show that a crime may have been committed. Baker v. McCollan, 443 U.S. 137, 143 n.2, (1979). Second, there must be sufficient evidence to establish a reasonable belief in the accused's guilt. Id. When making its determination on each prong, the court is not bound by rigid application of Federal Rules of Evidence (see United States v. Lang, 8 F.3d 268, 270 (5th Cir. 1993)), and shall render a common-sense conclusion. United States v. Froman, 355 F.3d 882, 889 (5th Cir. 2004) (citing United States v. Byrd, 31 F.3d 1329, 1340 (5th Cir. 1994)).

In this case, the Respondent does not dispute the first prong of probable cause – *i.e.* probable cause to believe a crime has been committed. Rather, the Respondent contends there is insufficient evidence to identify him as the person who committed the crime.

   1. <u>Charged Offense</u>

The formal International Extradition Request submitted by Ambassador Medina Mora summarizes the evidence and facts that associate the Respondent to the alleged crime. Gov't Ex. 1B. The report alleges that on November 26, 2006, the Respondent shot and killed Luis Alvarez a.k.a. La Tuza) with a firearm at the square located in front of the municipal hall of Mezquitic, Jalisco, Mexico.

2. Government's Evidence

Government's Exhibit 1C contains translated statements from multiple witnesses. The accounts vary, and are summarized below.[5]

    a. Statement of Edgar Robles – alleged eyewitness

Edgar Robles averred that on November 26, 2006, he was drinking beers with his cousin, Guillermo Bañuelos Robles ("Guillermo Robles"), at a house in Mezquitic, Jalisco that was located near the town square. His father, Felix Robles Bonilla ("Felix Robles"), and his uncle, the Respondent, Mauricio Robles Bonilla, were inside the house. Edgar Robles stated that after they began drinking beers, a local resident told Felix Robles that Luis Alvarez was in the town square. Next, Felix Robles and the Respondent began to walk towards the area where Luis Alvarez was sitting. Felix Robles removed his vest to fight Luis Alvarez, and Luis Alvarez broke a bottle on Felix's head and sprayed him with tear gas. After this happened, Edgar Robles reported that "my uncle [the Respondent] shot at him; I did not see the firearm(,) but he shot at Luis Antonio [Alvarez] several times." Next, Edgar Robles and his cousin, Guillermo Robles, ran to his father's vehicle (a Chevrolet Tahoe), while his father and the Respondent ran away to the streets. Edgar Robles drove the Tahoe to his grandmother's house to try and find his father and was told by a cousin that his father had fled to Monte Escobedo. Edgar Robles drove towards Monte Escobedo in search of his father, but was stopped by municipal police officers who handcuffed and presumably took Edgar into custody. The translated version of Edgar Robles's statement references a nine millimeter Smith and Wesson pistol that was found in a "van," which the court presumes is his father's Tahoe. Edgar Robles finishes his sworn statement with this sentence:

---

5    The witnesses use a variety of names to refer to certain individuals. Luis Alvarez is commonly referred to as "Antonio Navarro," "La Tuza," or "Toño," and the Respondent is referred to interchangeably as Mauricio or Maurilio Bonilla. Also, Guillermo Bañuelos Robles is referred to interchangeably by the witnesses as his alias, "Miguel Robles Martinez." For convenience, the undersigned uses the individual's proper names throughout this memorandum.

"The one who shot at them was my uncle MAURICIO ROBLES BONILLA, age 27, who lives in rancho Los Toriles, in the Municipality of Mezquitic, but all year long he lives in Nuevo Mexico or Arizona, in the United States of America."

      b.      Statement of Victor Cobarrubias – alleged eye witness

Victor Cobarrubias ("Cobarrubias") was present at the plaza on the day of the shooting and provided a statement to authorities. Cobarrubias reported that he was sitting near the main garden when Luis Alvarez passed and sat near him. After approximately thirty minutes, Cobarrubias saw a group of five people approach and stop in front of Luis Alvarez. Cobarrubias heard one of these men say, "Give me the gun." He saw Felix Robles say something to Luis Alvarez, and instructed someone from his group to "Take out the gun and shoot him." Cobarrubias saw Guillermo Robles fire a gun that hit Luis Alvarez in the face.[6] Next, Cobarrubias said he saw the Respondent fire a gun, shooting Luis Alvarez and making him fall to the floor.

      c.      Statement of Raul Alaniz Sanchez – alleged eye witness

Raul Alaniz Sanchez ("Raul Sanchez") was sitting with some friends on a bench when he saw "Los Peligrosos" approach Luis Alvarez. Raul Sanchez saw Los Peligrosos arguing with Luis Alvarez, heard two gun shots, then saw Luis Alvarez fall to the ground. Raul Sanchez identified Edgar Robles and Guillermo Robles as those who approached Luis Alvarez. He further averred that Guillermo Robles was the "person who shot at Luis Antonio Navarro Alvarez at a distance of some three meters with a firearm and wounded Luis Antonio [Alvarez] to death."

The evidence contains an additional, presumably subsequent though undated statement from Raul Sanchez. In this statement, Sanchez states that Felix Robles approached Luis Alvarez "as if he was looking for a fight," and further states that Guillermo Robles shot Luis Alvarez in the

---

[6] Cobarrubias clarifies his statement with the following: ". . . now I am shown a photograph . . . [of] Guillermo Bañuelos Robles whom I identify as one of the persons who killed Luis Antonio, but I want to clarify that I know him as Miguel Robles Martinez who now I know is also named Guillermo Bañuelos Robles."

face. Raul Sanchez got close to Luis Alvarez after the shooting, and heard the Respondent tell another man to give him the gun. This man took the gun out from his sweatshirt and gave it to the Respondent, who shot Luis Alvarez in the stomach. Raul Sanchez said he did not report the Respondent's second shots to authorities earlier because "everything happened very fast and [he] was nervous, [and besides he] was not so sure but later … recalled everything that happened."

        d.        Statement of Jose Luis Pacheco Vazquez – alleged eyewitness

Luis Pacheco Vazquez ("Vazquez") made a statement to authorities that he witnessed the murder of Luis Alvarez. Vazquez states that he was visiting a grocery store located in the plaza in Mezquitic, Jalisco. When he exited the grocery store, he saw Guillermo Robles standing near the plaza, and Guillermo told him he going to have a fight. Ten meters away from Guillermo stood Edgar Robles, the Respondent, and Felix Robles. Vazquez saw Guillermo Robles, Edgar Robles, the Respondent, and Felix Robles approach Luis Alvarez who threatened them with a broken wine bottle. Next, Luis Alvarez started fighting with Felix Robles and sprayed tear gas into his eyes. Vazquez heard someone yell, "Take out the gun," and saw the Respondent shoot Luis Alvarez. He said that Luis Alvarez was holding a semiautomatic weapon when he was shot, and fell to the floor. Next, Felix Robles, the Respondent and Guillermo Robles started running down the street, and Vasquez and Edgar Robles ran behind them. Vazquez ran to his mother's taco stand while Guillermo, Edgar, and Felix got into a white Chevrolet with Colorado license plates.

        e.        Jose Elias Nuñez Reyes – bystander who did not see the murder

Nuñez Reyes averred that he visited the plaza in Mezquitic, Jalisco with some friends on the day of the murder. He heard three gun shots and ran to the corner of the plaza. From there, he saw Luis Alvarez lying on the floor. He learned the next day that Luis Alvarez had died.

f. Jose Pedro Rangel Hernandez – bystander who did not see the murder

Jose Pedro Rangel Hernandez ("Hernandez") was at the plaza talking with Luis Alvarez and others on November 26, 2006. Hernandez stated that Luis Alvarez saw four or five men approach him, and believed it was their intent was to fight him. The approaching men were the Respondent, Felix Robles, Edgar Robles, Guillermo Robles, and Vazquez, known as "Los Peligrosos." As the men approached, Hernandez fled to a nearby church, where he heard three gun shots. After a while, the plaza cleared and Hernandez returned to see Luis Alvarez lying on the sidewalk bleeding.

g. Statement of Manuel Carlos Robles - bystander who did not see the murder

Manuel Carlos Robles ("Manuel Robles") made a statement to authorities one day after the murder. In his statement, he recounts that he was sitting on a fence in the main plaza of Mezquitic, Jalisco with some friends. Among his friends was Luis Alvarez, who was facing Manuel Robles when four or five individuals approached. These people seemingly wanted to fight Luis Alvarez, but Alvarez said that "he did not want anything to do with them, . . . stood up on the bench like wanting to run away trying to avoid the fight when suddenly gun shots were heard." Manuel Robles did not see the weapon, but ran to find a doctor after the shots were fired. Manuel Robles reported to the police that Edgar Robles and Guillermo Robles were among the men who approached Luis Alvarez. Despite identifying these individuals, who are known as "Los Peligrosos," Manuel Robles did not see who shot Luis Alvarez.

In summary, Mexican authorities identified and received statements from four eye-witnesses to the crime. Two of the witnesses, Edgar Robles and Jose Vazquez, unequivocally identified the Respondent as the sole shooter. Victor Cobarrubias and Raul Sanchez stated that Guillermo Robles shot Luis Alvarez first, and that the Respondent shot him a

14

second time.[7] The bystander witnesses did not see who shot Luis Alvarez. The witness statements constitute sufficient evidence to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the respondent's guilt. It is therefore sufficient to establish probable cause to believe the Respondent may have committed the charged offense.

    3.    <u>The Respondent's Evidence</u>

Mr. Kennedy, the Respondent's attorney, filed an affidavit summarizing information received from Edgar Robles during a meeting at the Buena Vista Minimum Center Prison in Buena Vista, Colorado, to discuss the events surrounding Luis Alvarez's murder. Mr. Kennedy submitted this affidavit with a "Motion to Present Testimony at Extradition Hearing" (Dkt. No. 30), arguing that Edgar Robles's statements provide explanatory evidence that negate probable cause.

Edgar Robles told Mr. Kennedy that his father, Felix Robles, had been having a yearlong conflict with Luis Alvarez, and that he believed that Luis Alvarez was involved in narcotics trafficking. On the night of the murder, Edgar recalls that he was in the plaza with his cousin, Guillermo Robles[8], his father, Felix Robles, and his uncle, the Respondent. A fight broke out near his father and uncle, resulting in "tear gas going off and everybody started to run." Edgar Robles turned away and ran, and heard several shots behind him; he told Mr. Kennedy that he did not see anyone with a gun, and did not see who shot Luis Alvarez.

Edgar Robles told Mr. Kennedy that after the shooting, he fled the scene with his cousin, Guillermo Robles, in a white Chevrolet truck looking for his father, Felix Robles. The two went to Monte Escobedo in search of his father, but were stopped by a police roadblock and arrested. The police searched the Tahoe and found Felix Robles's 9 millimeter handgun.

---

7    Raul Sanchez's first statement identified Guillermo Robles as the only shooter. He provided a subsequent statement to authorities that Guillermo Robles shot Luis Alvarez, but the Respondent shot him a second time.
8    Edgar Robles refers to his cousin as Miguel Robles Martinez, a/k/a Guillermo Banuelos Robles.

Edgar Robles told Mr. Kennedy that he was deprived of food, water, and sleep for almost forty-eight hours while he was jailed, and that he told the officers he did not see the shooting, and did not know who shot the gun. Both Guillermo Robles and Edgar Robles were tested for gunshot residue, and the Mexican police indicated to Edgar Robles that he would be released because no residue was found, but that Guillermo Robles would remain in jail because he tested positive for residue. Edgar Robles recalled that before he was released, the Mexican officials "made" him sign several documents that he did not read, but was told the documents were for releasing his Tahoe and other seized property. Guillermo Robles was held for over six weeks on the charge of homicide, and was later released to the U.S. Marshal for extradition to Colorado for trial on an unrelated criminal matter. Edgar Robles eventually surrendered himself to the authorities in Colorado, where he was ultimately convicted on criminal charges that were also unrelated to this murder.

Mr. Kennedy and Edgar Robles discussed his statement to Mexican authorities. Edgar Robles informed Mr. Kennedy that he had never seen the document and the statements contained within it were false. Edgar Robles recounted to Mr. Kennedy that he told authorities that he did not see and does not know who shot Luis Alvarez.

Mr. Kennedy's declaration is supported by two exhibits: sworn statement from Raul Sanchez (Dkt. No. 30, Ex. E) and Gustavo Ivan Ornelas Alvarez (Dkt. No. 30, Ex. F).[9] Both Raul Alanis Sanchez and Gustavo Ivan Ornelas Alvarez report that Guillermo Robles shot Luis Alvarez.[10]

---

[9] These statements were recovered from the investigative file of Guillermo Bañuelos Robles.

[10] It is worth noting that although Raul Alanis Sanchez identifies Guillermo Bañuelos Robles as the sole shooter in the statement attached to Mr. Kennedy's declaration as Exhibit E, Mr. Sanchez provided a subsequent statement (Government's Exhibit 1C), to Mexican authorities. Mr. Sanchez's subsequent statement reports that Guillermo Robles shot Luis Alvarez in the face, *and then* the Respondent shot him in the stomach.

4. Admissibility of the Respondent's Evidence

The right of a respondent to present evidence in an extradition proceeding is limited. Explanatory evidence which clarifies inherently suspect and uncorroborated evidence may be admitted and considered, especially when it completely negates all basis for probable cause. See In re Extradition of Gonzalez, 52 F. Supp.2d 725, 734, 741 (W.D. La. 1999); In re Extradition of Contreras, 800 F. Supp. 1462, 1464, 1469 (S.D. Tex. 1992). However, evidence that merely contradicts the government's evidence, such as competing stories, is not admissible. Id. The underlying rationale is that an extradition hearing is neither a criminal trial nor an adjudication of the charges. Id. at 1464-65. Rather, the sole inquiry is whether probable cause exists to hold respondent for plenary trial in the foreign jurisdiction where the alleged crime occurred. Escobedo v. United States, 623 F.2d 1098, 1102, n.5 (5th Cir. 1980).

In this case, the Government's evidence is corroborated – four eyewitnesses made statements to Mexican authorities that the Respondent shot Luis Alvarez.[11] Thus, explanatory evidence is not appropriate. Mr. Kennedy's affidavit and the supporting exhibits contradict rather than explain the evidence supporting probable cause. As such, it cannot be considered.

## IV. CONCLUSION

A review of the evidence reveals that there is probable cause to believe that the Respondent is the person who shot and killed Luis Alvarez on November 26, 2006. Consequently, the Extradition Request is **GRANTED**, and the Respondent is hereby **CERTIFIED** as extraditable.

### A. Certificate of Extraditability

Having determined that the evidence proffered by the United Mexican States is sufficient to sustain the charges to justify committal for trial in accordance with the laws of the United States,

---

[11] Although two of the witnesses reported that the Respondent shot Luis Alvarez *after* he was shot by Guillermo Robles, the accounts do not negate probable cause that the Respondent committed murder.

the extradition request should be **GRANTED**. The court hereby **CERTIFIES** Mauricio Robles Bonilla or Maurilio Robles Bonilla, a/k/a "El Pellejo" extraditable to the Secretary of State of the United States of America. The Respondent shall remain in the custody of the United States Marshal and confined in a proper facility until surrender is made to a duly qualified agent of the United Mexican States, or until further order from this court or from the Secretary of State.

B.  Notice

The court **DIRECTS** the Clerk of Court to deliver a copy of this Memorandum and Order, together with all formal extradition documents received into evidence, all evidence taken at the hearings and all memoranda of law filed on the issue of extradition, and all orders of court via certified mail (return receipt) to: U.S. Department of State, Secretary of State John Kerry, 2201 C Street NW, Washington D.C., 20520.

SIGNED this 4th day of March, 2014.

Zack Hawthorn
United States Magistrate Judge